1  Yvette Heinze
   Register Professional Reporter
2  Certified Shorthand Reporter
   PO Box 7312
3  Helena, MT 59604-7312
   406-454-7805
4  yvette_heinze@mtd.uscourts.gov

5  United States Court Reporter

6

7

                 **IN THE UNITED STATES DISTRICT COURT**
8                   **FOR THE DISTRICT OF MONTANA**
                        **GREAT FALLS DIVISION**
9

10 UNITED STATES OF AMERICA,        )   No. CR 17-48-GF-BMM
                      Plaintiff,    )
11        vs.                       )
                                    )
12                                  )
   JAYCOB TYLER KUTZERA,            )   **TRANSCRIPT OF SENTENCING**
13                    Defendant.    )
                                    )
14

15

16              **BEFORE THE HONORABLE BRIAN MORRIS**
                **UNITED STATES DISTRICT COURT JUDGE**
17                 **FOR THE DISTRICT OF MONTANA**

18
                Missouri River Federal Courthouse
19                 125 Central Avenue West
                    Great Falls, MT 59404
20                 Thursday, June 28, 2018
                    4:25 p.m. to 5:30 p.m.
21

22

23

24          Proceedings recorded by machine shorthand
        Transcript produced by computer-assisted transcription
25

1                                **APPEARANCES**

2   For the Plaintiff:

3                    Jessica Betley
                     Assistant U.S. Attorney
4                    OFFICE OF THE U.S. ATTORNEY
                     119 1st Avenue North, Suite 300
5                    Great Falls, Montana 59401

6
   For the Defendant:
7
                     Evangelo Arvanetes
8                    FEDERAL DEFENDERS OF MONTANA
                     3702 Montana Avenue, Suite 101
9                    Billings, MT 59101-2372

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2        (Defendant present.)

3        (Open court.)

4              THE COURT:  Please be seated.

5              Madam Clerk, please call the next case on the Court's

6    calendar.

7              THE CLERK:  This Court will now conduct a sentencing

8    hearing in Criminal 17-48, Great Falls, Judge Morris, United

9    States of America versus Jaycob Tyler Kutzera.

10             THE COURT:  Good afternoon, Ms. Betley.

11             MS. BETLEY:  Good afternoon, Your Honor.

12             THE COURT:  You're sitting in for Ms. Peterson?

13             MS. BETLEY:  That's correct, Your Honor.

14             THE COURT:  All right.  Well, it's always nice to see

15   you.  I'm sorry Ms. Peterson isn't here.  I have some questions

16   for her.

17             MS. BETLEY:  I am not sad I don't do these cases.

18             THE COURT:  Good afternoon, Mr. Arvanetes.

19             MR. ARVANETES:  Good afternoon, Your Honor.

20             THE COURT:  Good afternoon, Mr. Kutzera.

21             THE DEFENDANT:  Good afternoon, Your Honor.

22             THE COURT:  Ms. Betley, have you and Ms. Peterson

23   reviewed the presentence investigation report?

24             MS. BETLEY:  Yes, Your Honor.

25             THE COURT:  Do you have any objections?

1          MS. BETLEY:  There are no objections.

2          THE COURT:  Do you recommend that Mr. Kutzera receive

3  a two-level reduction in his offense level to recognize his

4  acceptance of responsibility?

5          MS. BETLEY:  Yes, Your Honor.

6          THE COURT:  I agree, and I will grant a two-level

7  reduction to Mr. Kutzera's offense level to recognize his

8  acceptance of responsibility.

9          Ms. Betley, do you intend to move for an additional

10  one-level reduction in Mr. Kutzera's offense level to recognize

11  his timely notification of plea?

12          MS. BETLEY:  Yes, Your Honor.

13          THE COURT:  That motion is granted as well.

14          Ms. Betley, has the victim been notified of the

15  proceeding?

16          MS. BETLEY:  Yes, Your Honor.

17          THE COURT:  And does she or her family wish to appear

18  here?

19          MS. BETLEY:  They've elected not to proceed today --

20  or be present today.  The only thing I'd like to address with

21  the Court is there is a letter from the victim that I believe

22  is attached to the PSR.  There's also a letter attached to

23  the PSR, I believe, from the victim's mother.

24          THE COURT:  Okay.

25          MS. BETLEY:  The victim's mother requested the US

1  Attorneys Office to ask if this letter could be read out loud
2  in court today.  But, otherwise, I believe the entirety of the
3  letter is attached to the PSR.  I have shown a copy of the
4  letter to Mr. Arvanetes.  He has a copy of it.  I can present
5  the Court with another copy of the letter to ensure that --
6          THE COURT:  I have a copy.  It appears here.
7          And she asked that it be read today?
8          MS. BETLEY:  She did.
9          THE COURT:  Any objection, Mr. Arvanetes?
10          MR. ARVANETES:  (Attorney conferring with client.)
11          No objection, Your Honor.
12          THE COURT:  Do you wish to read it, Ms. Betley?
13          MS. BETLEY:  Your Honor, if the Court desires it to
14  be read, I will read it.  If the Court has -- I will leave it
15  to your discretion.
16          THE COURT:  Well, go ahead and read.  Why don't you
17  come to the microphone and read it, please, if that's what she
18  wants.
19          MS. BETLEY:  Dear Honorable Brian Morris, First, I
20  really want to thank the courts for taking the time to read my
21  following statement:
22          I am the mother of the victim in a case that is
23  present in your court.  The crime that took place against my
24  daughter has been one of my worst nightmares.  I have had a
25  hard time writing this because it is like reliving all those

1   feelings again.

2          In April of 2016, my worst fear as a mother had came

3   true.  I was doing random checks on all of my daughters' phone,

4   like I always did, when I got to the victim's phone.  I had

5   opened up a set of messages from Jaycob Kutzera.  I had noticed

6   there was some very sexually explicit conversation going on.

7   When I had scrolled up, there were some very sexually explicit

8   pictures on her phone.  Sick to my stomach seeing what I was

9   seeing, I had asked her, first, why this was happening.  She

10  had stated that because he wanted her to.  Then I asked how old

11  he was, and she said, "Well, I don't know.  Somewhere around

12  20."

13          I kept the phone in my possession and directly called

14  the Great Falls Police Department, at which time they sent out

15  Officer Fisher.  While talking with Officer Fisher, giving him

16  the phone -- and he spoke with the victim -- she stated she is

17  to go to the bathroom.  This is where my next nightmare comes

18  into place.  My 12-year-old daughter was rushed to the

19  emergency room in Great Falls for attempting to kill herself.

20          The victim did this because of this grown man

21  persuading her to go against every moral she was raised with.

22  She had felt she let me and her family down.  Getting her the

23  help she needed by placing her in an inpatient behavior health

24  hospital for children in Helena, now having to drive back and

25  forth to Helena so I could be with my other three daughters in

Great Falls and being with the victim in Helena, was extremely hard on me as a single mother. Not only did this guy destroy her mentally and emotionally because of his actions, she tried to take her life. Writing this all down or even saying it all can never express what we all went through because of this.

He took a part of my 12-year-old daughter, knowing what he was doing was wrong as a grown man. That sweet, innocent little girl can never come back from this. She will never be the same again. Then he reached out to her again and continued to destroy her one text at a time. My little girl will never be the same again. She is very distrusting of just about everyone. He lied to her, stating he loved her just to get his way.

She is now reaching the age of 15 and still has a very hard time with depression, trust, and so much more. She has been in counseling since we have moved to another state, but there are times when she gets really depressed. And as a mother sitting here having your daughter come to you and tell you how disgusting she is and how she ruined our family -- reassuring her as a parent that she, in fact, is not disgusting, that what happened was, and that she is not at fault because he is a grown man. He knew what he was doing was wrong.

This horrible act has not only cost me financially but emotionally as well. And I am not really worried what it

1   has done to me, but the -- what it has done to all of my

2   daughters, driving a wedge between the girls.  My other three

3   daughters watching their sister try to end her life and

4   struggling to be happy and normal again, that is something no

5   amount of money could ever fix.

6          The victim is in therapy with a PhD-level therapist

7   that is working with her on how to cope with everything.  But

8   like I stated before, she at times believe this is all her

9   fault.  I have for surely made my household a lot stricter with

10   electronics because you never know what is going to happen, who

11   is going to be right there waiting to destroy a child for their

12   own pleasure.

13          I pray to the good Lord every night that he was

14   caught thanks to the amazing team that found his identity and

15   caught him, then the amazing team that I have worked with the

16   last couple years at the US Attorneys Office for making sure he

17   can never do this to another child again.  They have been so

18   amazing while working with my daughter.  That, right there, is

19   truly the only thing that has gotten us through this nightmare.

20          Thank you for your time.  Marci Schoby.

21          THE COURT:  Thank you, Ms. Betley.

22          All right.  Mr. Arvanetes, you have read the

23   presentence report?

24          MR. ARVANETES:  Yes.

25          THE COURT:  Have you discussed it with Mr. Kutzera?

1    MR. ARVANETES:  Yes, I have.

2    THE COURT:  Do you have any objections to it?

3    MR. ARVANETES:  No, I don't.

4    THE COURT:  Mr. Kutzera previously entered into a

5    plea agreement with the United States Government in this case.

6    He entered guilty pleas to three counts of sexual exploitation

7    of a child to Count I, Count V, and Count XXXVI.  Mr. Kutzera

8    also pleaded true to a forfeiture allegation.  I will accept

9    the plea agreement.

10   Mr. Arvanetes, any legal issues in which I need to

11   rule?

12   MR. ARVANETES:  Not that I know of, Your Honor.

13   THE COURT:  Ms. Betley?

14   MS. BETLEY:  No, Your Honor.

15   THE COURT:  Ms. Betley, do you intend to call any

16   witnesses?

17   MS. BETLEY:  No, your Honor.

18   THE COURT:  Mr. Arvanetes, any witnesses?

19   MR. ARVANETES:  My client's parents would like to

20   speak to the Court, as well as his stepdad.

21   THE COURT:  All three?

22   MR. ARVANETES:  All three.

23   THE COURT:  Okay.  Why don't you call them now,

24   please.

25   (Thomas Kutzera approaches podium.)

1          THE COURT:  Good afternoon, sir.

2          THE WITNESS:  Good afternoon, Your Honor.

3          THE COURT:  Would you please --

4          THE WITNESS:  My name is Thomas Kutzera.

5          THE COURT:  -- please state your full name and spell

6 your last name.

7          THE WITNESS:  Thomas Kutzera, sir.

8          THE COURT:  How do you spell your last name, please?

9          THE WITNESS:  K-U-T-Z-E-R-A.

10         THE COURT:  Go ahead, please.

11         THE WITNESS:  I am Jaycob's father.  Obviously, I

12 have known him all my life -- or all his life.  This is a very

13 sad situation.  But from knowing Jaycob all his life, this is a

14 very rare thing for him to do.  I know at the time he had just

15 broken up with a fiancée he had for six or seven years.  And

16 this fiancée kind of manipulated him because he was in the Army

17 National Guard, and he got kicked out because she had to have

18 him call her via cell phone, which was illegal.  He was in five

19 weeks out of six weeks of Boot Camp, and at that time he was

20 booted out because of the cell phone use.

21         This small manipulation continued on when he lived in

22 Arizona, and he came back to California.  They consequently

23 broke up.  He was devastated.  He was very hurt.  He came and

24 was living with his mom and his stepdad at the time.

25 Situations occurred where it was not a good situation for him.

1   He came down to live with me.  We attempted to get work for
2   him.  On this one -- he was still distraught at the time.  So I
3   gave him time to be able to come to grips with everything.  And
4   at this time he was beyond -- on the computers.  He was very --
5   he's very good at computers.  He enjoyed anime.  Even in my
6   class -- because I teach engineering as well -- he found a
7   liking and a love for that, and this was something that he
8   wanted to do in his future.  Facebook -- he had been on
9   Facebook.  He got a letter -- or a post sent out, and he
10  responded to the post, which turned out to be the victim at
11  this time.

12          It's a sad situation.  I don't condone it.  For me,
13  as a teacher and as a coach of adolescents, this is something
14  that we have to look out for all of the time.  We are bound to
15  do reporting of this if we find it.  I was unaware of this
16  until the day they came and pounded on my door asking for
17  Jaycob Kutzera.  At the time -- that was back in October, a
18  couple years ago, I believe, October of '16.

19          I have known Jaycob all of his life.  He doesn't have
20  any tendencies to do this.  He's not as mature as you would
21  like him to be, but he's an honest kid.  He's always willing to
22  help somebody no matter what and doesn't ask for anything in
23  return.  He's always trying to help somebody who is feeling
24  down.  And he's just a good kid, and he got caught up in a bad
25  situation.  At that time, should he have ran away and called

1  the police?  Absolutely.  He didn't.  He chose unwisely on this

2  one.  Hence, we are here.

3        I'd ask the Court, if there's any way, to help him

4  out on this.  We would -- I mean, it would be great.  I don't

5  know if your hands are tied or not, but I'm just asking the

6  Court for your ability to see where he is.

7        Thank you very much, Your Honor.

8        THE COURT:  Thank you very much, Mr. Kutzera.

9        MR. ARVANETES:  Thank you, Tom.

10        THE COURT:  Mr. Arvanetes, next.

11        MR. ARVANETES:  My client's stepdad, Your Honor.

12      (Mr. Vergilio approaches the podium.)

13        THE COURT:  Good afternoon, sir.  Would you please

14  state your full name and spell your last name.

15        THE WITNESS:  Joseph Allen Vergilio.  And it's V, as

16  in Victor, E-R-G-I-L-I-O.

17        THE COURT:  Go ahead, please.

18        THE WITNESS:  I'm Jaycob's stepdad.  And I've known

19  Jaycob most of his life, over 12 years and stuff.  And I am

20  just deeply saddened by this whole situation.  I'm saddened for

21  the girl because I don't think she is going to get the help she

22  needs, being in a situation where she's at with a parent like

23  her mother.  I mean, this happened before Jaycob, with Jaycob,

24  and after Jaycob.  So hearing her letter was quite -- seemed to

25  me quite ironic.

1    I'm deeply saddened that, from what I understand,

2  your hands are tied, and you can't deviate from the sentencing.

3  But I'm mostly saddened that the prosecuting attorney didn't

4  take the time, just an hour, probably, to take a look at this

5  young man and do some background research and see that he's

6  never done anything like this before.  He's a good kid.

7    I mean, I'm his stepdad, like I said.  I'm sure you

8  read my letter.  I don't have to be here, but I chose to be

9  here because I've been in trouble before.  I was in federal

10 prison.  I don't understand how this whole situation went down.

11 I mean, I was saved by a judge 20 -- almost 30 years ago, and

12 it turned my life around.  I'm a responsible business owner

13 now.  I've got 30 years clean.  And I can't wrap my head around

14 what's happening to this boy.

15    If anybody would just take the time to look -- and I

16 am sure you have numerous letters that show this isn't who

17 Jaycob is.  He's never done anything like this before.  He

18 would never do anything like this, that I know of.  I wouldn't

19 be standing up here before you if I thought that in any way,

20 shape, or form.  Because with my past, being in the world I was

21 in before I got clean and sober, if I thought in any way,

22 shape, or form that he was capable of purposely doing anything

23 like be this, I would be saying, "Your Honor, put him in jail

24 for 30 years."  But that's not the case.

25    I mean, I know that the situation he was in, he was

in a bad state of mind from the past relationship.  He ended up
moving down at his dad's because he was working with me at the
time and he was -- he couldn't even work.  We were falling
behind on our jobs.  So I ended up firing him.  We got into an
argument, and he moved down to his father's, and then all of
this stuff took place.  So I know he wasn't in a good state of
mind.

Before, as I said, he was a little bit immature.  I'm
so proud of him for the last year, watching him go through all
of this, and growing and becoming more mature and more
responsible.  And I commend him for taking the plea that he
did.

I don't see how the prosecuting attorney could charge
him with the crimes that she did because the victim put out the
first request for somebody to contact her.  He contacted her.
They talked for a month, month and a half, before any pictures
were sent.  So it's like they had a relationship going, all
when he thought she was over 21.

So then, later on, she tells him she's 12 or
whatever.  Yes, he made some bad choices after that, but I
think he was already emotionally involved, and he truly cared
for her.  And now to see him face 15 years or more in jail,
that's destroying his life.  And it breaks my heart, and it
breaks my heart that the Court -- or the prosecuting attorney
is willing to just take somebody's life and throw it away like

1  that.

2         So if there's anything that can possibly happen

3  today, Your Honor, I pray that it can, and he can be somehow

4  saved from all of this.  Thank you.

5         THE COURT:  Thank you very much, Mr. Vergilio.

6      (Ms. Susan Vergilio approaches the podium.)

7         THE COURT:  Good afternoon, ma'am.  Please state your

8  full name and spell your last name.

9         THE WITNESS:  Susan --

10        THE COURT:  Just pull that down, please, too.

11        THE WITNESS:  Susan Vergilio.

12        THE COURT:  Go ahead, please.

13        THE WITNESS:  The sexual exploitation of a child is

14  defined as any person who employs, uses, persuades, induces,

15  entices, or coerces any minor to engage in any sexually

16  explicit conduct.  By definition, this is not what happened.

17        Our son entered an adult-only site, which required an

18  administrator's approval to enter the site.  Upon joining, Jay

19  was under the impression that all the other people were adults

20  also.  Jane Doe was already on this adult site with a public

21  post requesting for anyone to respond to her.  Jay responded to

22  her request.  As they spoke, they began to realize they had

23  much in common.  An online relationship began and pictures were

24  exchanged between two consenting adults.  This was Jay's frame

25  of mind.

1        To his surprise, Jane Doe revealed, after sending

2   multiple pictures, that she was only 12 years old, dispelling

3   the prosecutor's theory that he was seeking her out and

4   grooming her to exploit her.  After gaining his knowledge of --

5   after gaining this knowledge, our son should have walked away.

6   But knowing this girl was troubled, Jay tried to help and

7   continued this relationship, making him guilty of being a good

8   person, not exploiting a minor.

9        As a mother, my heart is broken for both Jaycob and

10  this young lady.

11      (Witness crying.)

12          THE WITNESS:  Sorry.

13          Our son is a kind, caring individual who always puts

14  the needs of others before his own.  He is not some monster

15  that stalks young girls on the internet as the prosecutor wants

16  you to believe.

17          Sorry.

18          THE COURT:  Take your time.

19          THE WITNESS:  Second, it breaks my heart for this

20  troubled girl.  Using her body to gain affection from men who

21  are too old for her is such a wrong thing.  Any mother

22  knowingly allowing her daughter to exchange pictures with

23  adults should be prosecuted herself than blaming it all on our

24  son.  When she knew her daughter had already done this before

25  and has done it again since our son was arrested shows the lack

of parental supervision this child has.  Why isn't she in
protective custody?

Third, a life is being destroyed.  Our son will spend
15 years in prison and then have to register as a sex offender.
How is this justice?  He was in possession of picture which he
did not share, print, reproduce for anyone else.  He was not
found to be on any other child pornography sites or any other
sites relating to pedophilia.  He is guilty of being immature
and naive to the ways of the world, not exploiting a child.

Please, please, Your Honor, take these facts into
consideration and give Jaycob a fair sentence.

THE COURT:  Thank you, Ms. Vergilio.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.

Any other witnesses, Mr. Arvanetes?

MR. ARVANETES:  No, Your Honor.

THE COURT:  All right.  I also received 15 letters on
behalf of Mr. Kutzera:  Jeff Frazier, a family friend; Michael
Smith, a family friend; Alan Mann, a family friend;
Susan Vergilio, Mr. Kutzera's mother; Christopher Vergilio,
Mr. Kutzera's stepbrother; Lexi Epperson, a friend of
Mr. Kutzera's; Lloyd Pober, a family friend; Danielle Stahl, a
friend of Mr. Kutzera's; Mara Pober, a family friend;
Ileen Bernhard, Mr. Kutzera's stepsister; Joe Vergilio,
Mr. Kutzera's stepfather; Bill Epperson, who worked with

1 | Mr. Kutzera; Ryan Harper; Jessica Kutzera, Mr. Kutzera's
2 | sister; and Thomas Kutzera, his father.
3 |          I've read and considered those letters in determining
4 | an appropriate sentence for Mr. Kutzera.  Those letters will be
5 | part of the permanent record in this case.
6 |          Any other motions, Ms. Betley?
7 |          MS. BETLEY:  No, Your Honor.
8 |          THE COURT:  Thank you.
9 |          I'll summarize the applicable punishment faced by
10 | Mr. Kutzera for the offense of conviction of this case under
11 | both the sentencing guidelines and the applicable statute.
12 |          The base offense level for sexual exploitation of a
13 | child as charged in the indictment is 32.  The base offense
14 | level increases 2 due to the fact that the minor at issue was
15 | 12 years old during the commission of the offense.  The base
16 | offense level increases 2 more due to the fact the offense
17 | involved a commission of a sexual act or a sexual conduct.
18 | This leaves us with an adjusted offense level under Count I of
19 | 38.  The guideline calculation of Count V and Count XXXVI are
20 | identical to the calculation for Count I.  The adjusted offense
21 | level for Count V and Count XXXVI are both 38 as well.
22 |          Mr. Kutzera has entered guilty pleas to three counts.
23 | I must base the guideline calculation on the greater of the
24 | three adjusted levels.  This is the same, 38.  The offense
25 | level increases three more to account for the three separate

counts.

The base offense level decreases in light of my recognition of Mr. Kutzera's acceptance of responsibility.  The base offense level decreases one more in light of the government's motion to recognize Mr. Kutzera's timely notification of a plea.  All of these adjustments result in a total offense level of 38.  Mr. Kutzera has earned zero criminal history points.  That translates to a criminal history category of 1.

Under the sentencing guidelines, Mr. Kutzera could receive a term of imprisonment of 235 to 293 months. Mr. Kutzera faces a term of supervised release of five years to life.  He could receive a fine in the range of $50,000 to $250,000.  He's required to pay restitution.  He must pay a special assessment of $100 for each count, for a total of $300. Mr. Kutzera would not be eligible for a term of probation under the sentencing guidelines.

Under the applicable statute, each count of conviction carries a mandatory minimum term of imprisonment of 15 years up to a maximum of 30 years.  I must impose a term of supervised release of at least five years, up to a life term on each count.  These supervised release terms should run concurrently.

The statute provides for a maximum fine of up to $250,000.  The statute requires Mr. Kutzera pay restitution.

He must pay a special assessment of $100 for each count, for a
total of $300.  Mr. Kutzera is also subject to the provisions
of the Justice for Victims of Trafficking Act of 2015.  In
additional to the $100 special assessment, he must pay for each
count, he also must pay an assessment of $5,000 on each count
of conviction, for a total of $15,000, unless I find that
Mr. Kutzera is indigent.  Mr. Kutzera would not be eligible for
a term of probation under the statute.

Mr. Arvanetes, did I accurately state the possible
punishments faced by Mr. Kutzera under the sentencing
guidelines and the applicable statute?

MR. ARVANETES:  Yes, sir.

THE COURT:  Ms. Betley, do you agree?

MS. BETLEY:  Yes, Your Honor.

THE COURT:  Mr. Arvanetes, if you and Mr. Kutzera
would please approach the podium, I'll allow you to address the
Court.

Whenever you are ready, Mr. Arvanetes.

MR. ARVANETES:  Thank you very much, Your Honor.

Your Honor, as this Court knows, this case was going
to go to trial.  And so in preparation for the trial, I spent
many times -- occasions at the ICE office looking at texts.
And then, the week before trial, probably every day for about
five or six hours at the police station, looking at the texts
as well, making notes.

1    This was a unique relationship, and I feel bad about
2  the victim.  I feel bad because she was exchanging pictures
3  with another person.  I'm not sure why or whether that person
4  has been prosecuted.  She was also exchanging texts -- or not
5  texts, but messaging, I guess it's called, with Facebook with
6  other men.  And she just didn't have the proper supervision
7  that a parent, like most of us here are, would do to keep the
8  child in a functional world and be a functional human being,
9  rather than dysfunctional.  And that's what we have here,
10  unfortunately.

11    As the Court is aware and I put in my sentencing
12  memorandum, her own mother was charged with neglect, which was
13  pled down from a misdemeanor -- from a felony.  The male was
14  charged with nine counts of -- well, several counts, at least,
15  of having intercourse with this person, or sexual contact.  I
16  don't know if it was -- to what extent, intercourse or
17  otherwise.  But at this point, as far as I know, that person is
18  off docket for a competency evaluation.

19    But that raises serious concerns to me about the
20  welfare of this child and the welfare of her sisters as well.
21  It's sad.  It's not an indictment at all on this child.  But
22  it's unfortunate.  And it's unfortunate that even when she
23  moved to Arizona, that she was not protected.

24    This Court has to look at the 3553(a) factors, and
25  the characteristics and history of Jay is more unique than most

of my clients in the fact that he has no criminal history.  He
has never used drugs.  I think once he took a hit off a joint.
I think he got drunk once.  So no deviant history.  Like his
dad said, no history of child pornography or possession of
child pornography.  And yet -- and I tried in vain, Your Honor.
I tried in vain to get a lesser sentence for Jay.

        And, you know, it's unfortunate that we're in the
situation that we are, you know, in a political system that
there's almost a zero-tolerance policy with high counts, with
the highest count.  And even Ms. Peterson's, I know, hands were
tied.  She acted very professionally throughout this case, as I
put in my sentencing memorandum.

        I wish there was something that could have been done,
though, because not looking at the whole situation, not looking
at Jay as a human being, and rather just looking at a piece of
paper and saying, "This is what he's charged with," it's sad.
It's sad.  Every case is unique.  And this system that we're in
today treats every case the same.  And there's nothing we can
do.  There's nothing we can do.  And that's really the sad
thing about it.

        I don't envy this Court at all, as Mr. Smith in the
letter said as well, that this Court has to sentence Jay to
15 years in prison for an offense where some people with hands
on would have less time.  People in his counseling group in
California for charges similar to Jay were getting less time:

Six years, seven years, three years, four years.  Jay would take that in a heartbeat, but he's looking at 180 months.  He's looking at 15 years.

Mr. Smith used the term "man child."  In our system, we don't look enough at the mental status of the client.  A lot of these men who are doing this kind of behavior are socially inept people.  They only communicate by computer.  That's what we have here.  He's a person who is probably very immature for his age, as the people in the letters who know Jay all his life have said.  And yet we can't take that really into consideration because we're stuck with the mandatory minimum of 15 years, which has tied this Court's hands and a system in Washington that's tied the prosecutor's hands.

So it's a sad day for justice.  It's a sad day for justice, and I can't say anything else.  I wish I could, but I can't.

THE COURT:  Thank you, Mr. Arvanetes.

Mr. Kutzera, you have a right to speak, sir.

THE DEFENDANT:  Yes, Your Honor.  Hello, Your Honor.  I just want to start, first, by saying that for the victim, I am extremely sorry for my actions.  What I did was wrong.  I would not wish it on my own child.  I would not wish it on anybody else.  I take full responsibility for what I did.

That being, however, the circumstances of what I did should have been taken into account for the prosecutor.  This

1  was -- there was -- in the discovery, there was statements

2  that -- what other pedophiles do.  They communicate with each

3  other.  They share these pictures with each other.  They go on

4  to other sites.  I have done none of this.  None of this.

5        When I met the victim, we had talked for a while.

6  She had told me she was of age.  Then, after we had begun our

7  alleged relationship, she told me her age.  Yes, I should have

8  left.  I should have gone.  I should have blocked her on

9  Facebook.  Blocked her number on my phone.  I should have done

10  the whole thing.

11        But she had talked to me about the struggles she was

12  having at home, and me being -- I know in one letter, I believe

13  it's from my friend Danielle, I'm a big teddy bear.  I will

14  admit, yes, I am immature for my age.  I will fully admit that

15  and cop to that, Your Honor.

16        All I want to do is help.  I love helping people.

17  It's a betterment for society and for America at large if more

18  people helped each other, and that's what I was doing in this

19  situation, Your Honor.  Yes, it still does not excuse me of my

20  actions, and I understand that.  But I was not trying to groom

21  this girl or persuade her to do actions that I wanted.  This

22  was something that both of us mutually agreed to.

23        And she had sent me several photos of her attempting

24  to take her life.  All of the times, I talked her out of it and

25  talked her down.  I couldn't sit her down physically and talk

1  to her.  We never had any physical contact at all, ever.  It

2  never really interested me to do physical contact.  But those

3  photos that she sent me, one was of a firearm to her head,

4  another was a knife to her throat.  Both times I talked to her

5  calmly, just talked her out of it, tried to help her, tried to

6  help her see, you know, she was worth something; that she

7  wasn't this worthless, pathetic person that she called herself.

8  And that's what this was, Your Honor.  I tried to help.

9         I wasn't trying to do this for my own personal gain.

10 I wasn't trying to do this for some evil, sadistic -- what's

11 the word?  -- I'm sorry, Your Honor.  The word escapes me right

12 now.  But it's not who I am.  It's not who I am as a person.

13         Again, I understand the consequences of my actions.

14 And while I think what has been given to me is unfair, if that

15 is what has to happen, that I will be willing to take it, Your

16 Honor.

17         That's all, Your Honor.

18         THE COURT:  Thank you, Mr. Kutzera.

19         Mr. Kutzera, sadly, the victims of sexual abuse --

20 whether hands-on abuse, exploitation through child pornography,

21 or otherwise, the internet -- they typically don't necessarily

22 come from perfect families.  They are not usually from houses

23 with two parents at home and working.  They typically come from

24 houses where there's one parent.  There are, sometimes, we

25 hope -- maybe there's some other random adults floating

through.   You know, the hands-on abuse doesn't happen at the
hands of strangers.   It happens at the hands of people who have
access, either through their relationship with a parent --
there might be a boyfriend or girlfriend of one of the parents,
a stepfather, an uncle, a grandfather, where they might get
some access to that child.   They take advantage of the lack of
supervision the child has at home.   They take advantage of the
lack of confidence the child might have because they weren't
raised with solid parents to help them develop properly.   So
those are the types of people who get sexually abused in a
hands-on way.   That same pattern is transferring to the
internet, now, where people get exploited online; people whose
parents are not paying attention to what's going on.

So the fact that you encountered this victim who has
some serious problems is not surprising, and she was somewhere
where she shouldn't have been, on a site where she shouldn't
have been.   And she should have had adults there looking out
for her to make sure she wasn't doing something stupid.
Because we put -- in our society we put the burden on the adult
in the room to make the right decision.

This child was not properly supervised.   Sounds like
she's got a very tough lot in life at home with her family, and
she's seeking something online.   I'm not sure if we'd call it
affection, love -- whatever she's seeking online, and she winds
up in your lap, and you are the adult in the room.   And when

1   you say you tried to help when she sent you photographs of her

2   with a gun to her head and a knife to her throat, that must

3   have been pretty shocking, I'm sure.

4        The answer, though, in your situation when that

5   happens is not to talk her down -- and that's a good impulse --

6   but to seek help for her.  Contact someone in your life who can

7   help:  Your parents, police, whoever it might be, someone who

8   can help this girl.  That's what you do if you really want to

9   help.  She's not getting that help at home.

10        And the answer isn't "I'll continue being her friend"

11  when that friendship comes with benefits.  You are the one who

12  has to make the decision to be the adult there.  I know you are

13  a young man, but you are an adult, and that was when you made

14  your mistake.  I'm not accusing you of going out and seeking

15  out this girl.  I'm not accusing you of seeking to exploit

16  anybody.  But it happened, and she ends up in your screen.  And

17  when you saw that behavior, the answer was to seek help for her

18  with someone who could help her.  You are not trained or

19  equipped to do that.

20        And when you found out she was 12 years old, that was

21  the time to say, "This is nuts.  I have to stop.  I am not

22  being her friend."  You are deluding yourself there thinking

23  you're being her friend by continuing to have this

24  relationship, given the age difference.  That's where you had

25  to think, "What am I doing here?  I'm the adult here."  She's

1  not able to make a decision, like to break this off, because

2  she's 12 years old.  That's what 12-year-olds do.  They're

3  impulsive.  They're on the verge of adolescence.  Their

4  hormones are raging.  They are not making good decisions.

5          So the burden falls on you, under the law, to make

6  that decision to say, "This is nuts.  I need to get help for

7  myself and for her and end all of this."  And that's what you

8  are being punished for.

9          And the punishment is harsh.  I understand that.  You

10  are going to have to try to use your time in custody as best

11  you can.  Recognize the mistakes you made and the inappropriate

12  behavior you engaged in because there's no excuse for

13  exchanging sexually explicit material of a 12-year-old.  That's

14  not friendship.  That's a relationship, but it's a twisted

15  relationship because of the age difference.  She's not capable

16  of handling that kind of a relationship, and you have to be the

17  one held responsible for that.

18          I hope you can use your time in custody productively.

19  You have family backing you.  They've supported you through all

20  of this.  I have a number of letters of people supporting you.

21  You are going to have to try to move beyond this.  It's going

22  to be a challenge.  You are a young man.  You've got a long

23  life ahead of you.  This is going to take a chunk out of that,

24  but it means you have to take advantage of the time while you

25  are in custody.  There are programs available for people in

custody to understand why you were sucked into this, why you
didn't have the strength to say, "I've got to get out of this.
This is wrong.  I'm hurting someone.  I need to get her help."
Figure out who you are as a person.

Also, further your education, learn new skills.  If
you have computer skills, learn programming skills.  There are
programs available.  But don't waste your time because when you
get out, you are going to need all of the education and
experience you can get to succeed in life.  And I hope your
family stays with you to support you through this process.

But, ultimately, you have to understand you are the
adult here.  A bad thing happened.  You could have stopped it.
You rationalized why you shouldn't stop it.  You rationalized,
"I was helping her" somehow.  You were helping her, but not
really.  You might have been keeping her alive on that day, but
this relationship wasn't helping her.  This is what she -- she,
apparently, is drawn to these kinds of relationships now
because that's what she's known, and that's a sad fact.  Her
development has been stunted, and it likely will be stunted for
her whole life.  You are not responsible entirely for that.
You're responsible for one small part of that.

And I can't punish anyone else in this case.  I can't
punish the mother for lack of supervision or negligent.  I
can't punish anyone else who may have harmed this child.  You
are the only one in my court, and you are the one I have to

1   punish.

2          All right.  Anything else, Mr. Arvanetes?

3          MR. ARVANETES:  No, Your Honor.

4          THE COURT:  You and Mr. Kutzera may be seated.  Thank

5   you.

6          Ms. Betley.

7          MS. BETLEY:  Your Honor, I think the Court aptly

8   stated the situation here, and the severity of what happened

9   here, and I think all parties agree that this is a horrific and

10  sad incident for the victim, the defendant, the family,

11  everyone impacted, and there is no good resolution.

12         The government is requesting a low-end guideline

13  sentence here.  I do recognize that Mr. Kutzera does not have

14  any criminal history, which is unusual coming into this court.

15  I'm asking for a low guideline sentence, followed by a life

16  term of supervised release.

17         In addition, the government is requesting an amount

18  of restitution be imposed in the amount of $7,405.90.  That is

19  less than what is contained in the PSR, but what the victim has

20  requested here, after other payments and insurance-type

21  payments have been made.

22         THE COURT:  Give the amount again, please.

23         MS. BETLEY:  $7,405.90.

24         THE COURT:  Is there a stipulation on that amount

25  with the defense?

1        MS. BETLEY:  I believe Mr. Arvanetes does agree.

2        MR. ARVANETES:  We concur, Your Honor.

3        THE COURT:  All right.  $7,405.90.

4        MS. BETLEY:  Correct, Your Honor.

5        THE COURT:  Thank you.

6        MS. BETLEY:  Your Honor, lastly, I think whatever

7   term of imprisonment the Court decides to impose here will

8   account for the defendant's actions, and especially what took

9   place after the defendant knew that the victim was 12 years old

10  and the horrific text and images and electronic media that was

11  passed back and forth.  Those images are memorialized forever,

12  and it's a tragic situation for all involved.

13       THE COURT:  All right.  Ms. Betley, I said at the

14  outset I was sorry Ms. Peterson couldn't make it, so you are

15  going to have to be the vehicle to pass on my sentiments to

16  Ms. Peterson and anyone else in the US Attorneys Office who

17  would be appropriate.

18       MS. BETLEY:  Yes, Your Honor.

19       THE COURT:  One of my obligations is to ensure that I

20  do not impose disparate sentences in cases, and I want to talk

21  about a few cases, if you would pass this on, please.

22       First case is the Weaver -- Connolly?  Is that the

23  name?  Joyner.  Weaver-Joyner case.

24       MS. BETLEY:  I'm familiar.

25       THE COURT:  So Ms. Joyner was the mother of two

1   daughters, one of whom raised an allegation of hands-on abuse

2   by her mother and Mr. Weaver.  Authorities investigated and

3   determined that was a retaliatory accusation.  The parents

4   responded by kicking that daughter out of the house and

5   inviting one of her girlfriends to join the family, where the

6   girlfriend, who was an adult by that time, was involved in

7   sexual activity with Ms. Joyner, Mr. Weaver, and the six- or

8   eight-year-old daughter during that period, along with animals

9   and other things.  And they produced pornography and engaged in

10  hand-on abuse for a number of years.

11       And the recommendation for Ms. Joyner in that case,

12  who had hands-on abused her own daughter, was involved in the

13  production of pornography involving her own daughter, was

14  260 months.

15       I can't understand how that case could even be in the

16  same universe as this case.  I don't understand the charging

17  decisions on that one.  I don't see how Mr. Kutzera could be

18  considered in any way an offender as culpable as Ms. Joyner.

19  Now, I understand the government asked for a long sentence of

20  Mr. Weaver.  He deserved every month of that.

21       The next case I want to talk about is Mr. Bennett.

22  Mr. Bennett was charged initially in state court with hands-on

23  abuse of a six-year-old daughter who was a child of his

24  girlfriend.  He was living in the house.  He was acquitted in

25  state court of that charge and then ultimately charged in

1   federal court after the mother of the child found Mr. Bennett's
2   telephone, cell phone, in his car and after the daughter
3   disclosed the fact that Mr. Bennett had molested her hands-on
4   and made a film of it and turned it over to authorities -- or
5   to a therapist who turned it over to authorities.

6           Mr. Bennett was charged with sexual exploitation,
7   plus receipt of child pornography.  I'm not sure what happened
8   in that case.  Ultimately, it was pled down to receipt of child
9   pornography, which has a mandatory five-year minimum.  There
10  may have been problems of proof in that case, but the
11  allegations were quite serious against Mr. Bennett.  So I'm not
12  sure how Mr. Bennett warrants the receipt of a child
13  pornography charge, and Mr. Kutzera has this sexual
14  exploitation charge.

15          And then the last one is Mr. Dragonfly.
16  Mr. Dragonfly was involved in a scheme where his girlfriend had
17  two teenage daughters for whom the mother was basically serving
18  as a pimp.  One of them was about 12 years old, and one of them
19  was slightly older.  One of the boyfriends of one of the
20  daughters was convicted here of sexual exploitation.  They were
21  shooting them up with methamphetamine, and trading
22  methamphetamine for sex with the girls.

23          And Mr. Dragonfly was kind of the mastermind behind
24  all of that, and he has been charged and is rightly facing, I
25  believe, a 30-year mandatory sentence.  He was involved in both

1  the hands-on exploitation of those two girls, as well as
2  supplying them with methamphetamine and serving as a pimp for
3  them.  And I think that case strikes me as rightly charged, and
4  he faces a punishment that he deserves.

5        I can't see Mr. Kutzera in the same universe as
6  Ms. Joyner or Mr. Dragonfly, and that's the kind of sentence
7  given the charge to which he's entered pleas here that the
8  guidelines direct.  I can't understand the charging decisions.
9  I understand the guidelines are the guidelines, but that's
10  based upon the charging decisions here.  And there was no
11  allegation -- Mr. Kutzera, as I said, made a stupid mistake.
12  He knew this girl was 12 years old, and he claims he thought he
13  was helping her.  He was helping her in no way.  In fact, he's
14  just continuing her exploitation.  And because she is
15  vulnerable and because she has no adult in her life to whom she
16  can turn and say, "I need help," she is a victim waiting to be
17  exploited.  And when his turn came, he took advantage.  He did
18  not carry forward any hands-on abuse.  But he, in my view, does
19  not fall in the same universe as what Mr. Dragonfly has done,
20  what Ms. Joyner has done, and what Mr. Bennett was accused of
21  having done.

22        So I want you to carry those questions back to the
23  appropriate people in your office, and those will come up at
24  future sentencing hearings.

25        MS. BETLEY:  Your Honor, I will gladly do that, and I

1  can't say I disagree.

2         THE COURT:  All right.  Thank you very much,

3  Mr. Betley.  I appreciate your time.

4         I'll summarize the position of the parties.  Under

5  the sentencing guidelines, I could impose a term of custody of

6  235 to 293 months and a term of supervised release of five

7  years to life.  Mr. Arvanetes has requested a mandatory minimum

8  sentence of 180 months of custody.  Ms. Betley, on behalf of

9  Ms. Peterson, representing the government, is recommending a

10  low-end guideline sentence of 235 months followed by a lifetime

11  of supervised release, as well as a restitution amount of

12  $7,045.90.  My obligation is to impose a sentence that is

13  sufficient but not greater than necessary.

14         In determining the appropriate sentence, I have

15  considered the applicable statutory provisions, the advisory

16  guideline sentence range, the applicable guideline principles,

17  the parties' recommended sentencing range, and all of the

18  factors in Title 18, United States Code, Section 3553(a),

19  including Mr. Kutzera's history and characteristics, the

20  seriousness of this offense, the obligation to promote respect

21  for the law, the obligation to provide just punishment, the

22  obligation to provide deterrence, the obligation to protect the

23  public from further crimes by Mr. Kutzera, and the obligation

24  to provide Mr. Kutzera with needed educational and vocational

25  training and medical care.

1      I've read and considered all the information that's

2   been provided to me, including the presentence investigation

3   report, the statements of this hearing by Mr. Arvanetes,

4   Mr. Kutzera's own statement, the statement by his mother,

5   father, and stepfather, and Ms. Betley's statements on behalf

6   of the US government.  I believe the sentence imposed certainly

7   will protect the community, will overstate the seriousness of

8   this offense, will provide just punishment of the law -- and I

9   can't say that it won't be disparate to sentences of defendants

10  convicted of similar offenses.

11      Mr. Arvanetes, if you and Mr. Kutzera would please

12  approached the podium, I'm prepared to impose sentence.

13      I want to say, again, the sexual abuse in our society

14  is a serious, serious problem.  We're always worried about the

15  stranger coming into our lives and being the one to abuse our

16  children, and that doesn't happen very often.

17      In this case, Mr. Kutzera, you weren't a stranger --

18  initially, you were a stranger, but you described yourself as a

19  friend by the time the abuse was happening.  That's not being a

20  friend.  As I said, that's hurting this child who needed

21  protection, had no other protection, and for that decision I

22  have to punish you.

23      In considering all of those factors, I believe a

24  downward variance from the guideline range is appropriate in

25  light of Mr. Kutzera's lack of criminal history, in light of

his hands-on -- any indication of any inclination for hands-on
abuse, and to avoid, as much as possible, disparate sentences.

It is the judgment of the Court that the defendant,
Jaycob Tyler Kutzera, is hereby committed into the custody of
the United States Bureau of Prisons for a term of 180 months on
Count I, 180 months on Count V, and 180 months on Count XXXVI,
with all terms to run concurrently.

Mr. Arvanetes, did you have a placement request?

MR. ARVANETES:  We do, Your Honor.  Two, actually, if
the Court would indulge us on two requests.  One is for
Victorville and the other is Terminal Island.

THE COURT:  Why those places?

MR. ARVANETES:  And then the other request -- and
we've talked about it with family, and that is if the Court in
any way can ask the Bureau of Prisons to place Jay in
protective custody to ensure his safety.  I know that that can
be difficult with the BOP, but that is something that we
request.

(Off-the-record discussion between the Court and the US
    Marshal.)

THE COURT:  All right.  It is recommended the United
States Bureau of Prisons consider housing Mr. Kutzera at the
facility in Victorville, California, or Terminal Island,
California, to allow him to be near his family during his
period of custody whose support he'll need to survive that

1  period of custody and upon release.

2         It is further recommended the Bureau of Prisons

3  evaluate the proper placement for Mr. Kutzera and consider

4  whether he needs some sort of protective custody.

5         Mr. Arvanetes, it's my understanding that the Bureau

6  of Prisons will do an evaluation and determine a risk level and

7  security level and make that determination both based upon the

8  nature of the offense and Mr. Kutzera's characteristics.

9         MR. ARVANETES:   Thank you.

10        THE COURT:   It is recommended Mr. Kutzera participate

11 in residential sex offender treatment at a facility designated

12 by the Bureau of Prisons, as well as any educational and

13 vocational program, if eligible.

14        Upon release, Mr. Kutzera shall be placed on

15 supervised release for a period of five years on Count I, five

16 years on Count V, and five years on Count XXXVI, with all terms

17 to run concurrently.

18        Within 72 hours of release from the custody of the

19 Bureau of Prisons, Mr. Kutzera shall report in person to the

20 probation office in the district to which he's released.

21        While on supervised release, Mr. Kutzera shall not

22 commit any federal, state, or local crime and shall not possess

23 a controlled substance.

24        Mr. Kutzera shall be prohibited from owning, using,

25 or being in constructive possession of firearms, ammunition, or

1  other destructive devices while on supervision, and anytime

2  after the completion of the period of supervision, unless

3  granted relief by the Secretary of the Treasury.

4          Mr. Kutzera shall cooperate in the collection of DNA,

5  as directed by the US Probation Office.

6          Mr. Kutzera shall comply with the requirements of the

7  Sex Offender Registration and Notification Act set forth in

8  Title 42, United States Code, Section 16911, thereafter, as

9  directed by the US Probation Office, the Bureau of Prisons, or

10  any state sex offender registration agency in which he lives,

11  works, is a student, or is convicted of a qualifying offense.

12          Mr. Kutzera, you also must comply with the standard

13  conditions of supervision as recommended by the US Sentencing

14  Commission that have been approved by this Court.

15          You also must comply with the following special

16  conditions:

17          Number 1, you shall have no contact with the victim

18  in this case.

19          Number 2, you shall submit your person, any property,

20  residence, vehicles, papers, computers as defined in Title 18,

21  US Code, Section 1030(e)(1), other electronic communications or

22  data storage devices or media to which you have access, to a

23  search at a reasonable time and a reasonable manner, with or

24  without a warrant by the United States Probation Officer, with

25  reasonable suspicion concerning a violation of a condition of

supervision or unlawful conduct by you.  Your failure to submit
to search may be grounds for revocation.  You shall warn any
other occupants, adults, and minors that the premises may be
subject to searches pursuant to this condition.  You shall
allow seizure of suspected contraband for further examination.

Number 3, you shall enter and complete successfully a
sex offender treatment program.  You are to enter a program
designated by, and until released by, the US Probation Office.
You will pay all or part of the cost of treatment as directed
by the US Probation Office.

Number 4, you shall not be allowed to do the
following without prior written approval of the US probation:
Knowingly reside in the home, residence, or be in the company
of any child under the age of 18, with the exception of your
own children, go to or loiter within 100 yards of schoolyards,
parks, playgrounds, arcades, or other placed primarily used by
children under the age of 18.

Five, you shall not possess camera phones or
electronic devices that could be used for covert photography
without the prior written approval of the US Probation Office.

Six, you must not have access -- you must not access
the internet except for reasons approved in advance by the
probation office.

Seven, you must allow the probation office to install
computer monitoring software on any computer, as defined in

1  Title 18, US Code, Section 1030(e)(1), that you use.

2          Eight, to ensure compliance with the computer

3  monitoring condition, you must allow the probation office to

4  conduct initial and periodic unannounced searches of any

5  computers, as defined in Title 18, United States Code,

6  Section 1030(e)(1), subject to computer monitoring.  These

7  searches shall be conducted for the purchase of determining

8  whether the computer contains any prohibited data prior to

9  installation of the monitoring software; to determine whether

10 monitoring software is functioning effectively after

11 installation; and to determine whether there have been attempts

12 to circumvent the monitoring software after its installation.

13 You must warn any other people who use these computers that the

14 computers may be subject to searches pursuant to this

15 condition.

16         Number 9, you may own or possess only one device

17 approved by the United States Probation Office that has access

18 to online services.  If that device is not a phone, you may

19 also possess one mobile phone that has no online capability or

20 camera.

21         I suspect these conditions will be entirely obsolete.

22         You shall notify the probation office of the devices

23 before your initial use.  You shall not own, possess, or use

24 any additional devices without the prior written approval of

25 the US Probation Office.  Your approved devices shall be

capable of being monitored and compatible with monitoring
hardware, software, or other technology approved by the
probation office.  You shall allow the probation office to make
unannounced examinations of all computer hardware and software,
that may include the retrieval and copying of all data from
your computer.  You shall allow the probation office to install
software to restrict your computer access or to monitor your
computer access.  You shall pay the cost of monitoring, as
directed by the United States Probation Office.  You shall not
use any computer device to access sexually explicit materials
as defined in these conditions or to contact minors or gather
information about a minor.  You shall not possess encryption or
steganography software.  You shall provide records of all
passwords, internet service, and user identifications, both
past and present, to the probation office and immediately
report changes.  You shall sign releases to allow the probation
office to access phone, wireless, internet, and utility
records.

          Ten, you shall not knowingly --  I think we already
did that one.

          Ten, you shall consent to third-party disclosure to
any employer or potential employer concerning any
computer-related restrictions that are imposed, unless excused
by the probation office.

          11, you shall -- we've already dealt with monitoring.

1  And we already did that one.

2          11, you shall participate in a program for mental
3  health treatment as deemed necessary by the United States
4  Probation Office until the probation office releases you from
5  the program.  You shall pay all or part of the cost of the of
6  treatment by directed by the probation office.

7          12, you shall submit to not more than six polygraph
8  examinations per year as directed by the US Probation Office to
9  assist in treatment, planning, and case monitoring.  You
10 maintain your Fifth Amendment rights during polygraph
11 examinations, and you may refuse to answer any incriminating
12 questions.  You will pay all or part of the cost of
13 examinations as directed by the probation office.

14         And, 13, you shall pay restitution in the amount of
15 $7405.90 at a rate to be determined by the US Probation Office.
16 Payments shall be made to the clerk, United States District
17 Court, Missouri River Courthouse, 125 Central Avenue West,
18 Suite 110, Great Falls, Montana 59404, to be disbursed to the
19 victim in this case.

20         The Court finds Mr. Kutzera lacks the ability to pay
21 a fine and hereby waives the fine.

22         It is further ordered Mr. Kutzera shall pay the
23 United States a special assessment of $100 per count of
24 conviction, for a total of $300, which shall be due
25 immediately.

1          It is ordered that the interest be waived pursuant to
2     Title 18, United States Code, Section 3612 (f)(3)(A).
3          The Court finds Mr. Kutzera is indigent and declines
4     to order that he pay the additional mandatory special
5     assessment of $5,000 per count as required by Title 18, United
6     States Code, Section 3014.
7          While incarcerated, criminal monetary penalty
8     payments are due during imprisonment at the rate of not less
9     than $25 per quarter.  Payment shall be through the Bureau of
10    Prisons' Inmate Financial Responsibility Program.  Criminal
11    monetary payments shall be made to the clerk, United States
12    District Court, Missouri River Courthouse, 125 Central Avenue
13    West, Suite 110, Great Falls, Montana 59404.
14         Ms. Betley, has there been an order of forfeiture
15    entered with the computer and cell phone?
16         MS. BETLEY:  Your Honor, there's been a preliminary
17    order of forfeiture entered.  The government is waiting on the
18    final deadline and will file the final order of forfeiture
19    shortly.
20         THE COURT:  All right.  Thank you.
21         And, Ms. Betley, any counts to be dismissed?
22         MS. BETLEY:  Yes, Your Honor.  The government moves
23    to dismiss the remaining counts, which are Counts II through
24    IV, VI through XXXI, and XXXIII to XXXV.
25         THE COURT:  Counts II through IV, dismissed. And

1  Counts VI through --

2          MS. BETLEY:  XXXI.

3          THE COURT:  -- are dismissed, and Counts XXXIII to

4  XXXV.

5          MS. BETLEY:  Correct.  Count XXXII was previously

6  dismissed.

7          THE COURT:  All right.  Counts XXXIII to XXXV are

8  dismissed.

9          Mr. Kutzera, it appears you've waived your right to

10 appeal your sentence.  If you nevertheless wish to pursue an

11 appeal, you must file a written notice of appeal to the clerk

12 of the court with 14 days of today's date.  If you fail to file

13 an appeal within 14 days, your appeal could be dismissed as

14 untimely.

15         Do you understand, sir?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Mr. Arvanetes, any legal objections to

18 the sentence?

19         MR. ARVANETES:  No, Your Honor.

20         THE COURT:  Ms. Betley?

21         MS. BETLEY:  No, Your Honor.

22         THE COURT:  Mr. Arvanetes, your client is not in

23 custody.  Do you wish to have him self-report?

24         MR. ARVANETES:  Yes, sir.

25         THE COURT:  Mr. Kutzera, if you self-report, you are

1  responsible for getting yourself to the facility designated by

2  the United States Bureau of Prisons at the date and time they

3  tell you at your own expense.  If you fail to show up at that

4  facility at that date and time, you could be considered a

5  fugitive subject to immediate arrest.

6          Do you understand?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Alternatively, I could remand you to the

9  marshal service, who would transport you to the facility.

10          Does he wish to self-report, Mr. Arvanetes?

11          MR. ARVANETES:  In prior talks with my client and his

12  family, if it would please the Court, yes, sir.

13          THE COURT:  What's the government's position,

14  Ms. Betley?

15          MS. BETLEY:  Your Honor, I am not aware of any

16  violations at this point.  I would leave that with the

17  discretion of the Court.

18          THE COURT:  All right.  Mr. Kutzera has appeared, as

19  far as I know, every time here.

20          Is there a bond in California, Mr. Arvanetes?

21          MR. ARVANETES:  Yes.  The family put some sort of

22  house, or something like that, as bond.

23          THE COURT:  All right.  That remains in effect.

24          Mr. Kutzera, I will allow you to self-report.  Before

25  you leave here today, you need to speak to this gentleman over

1  here with the marshal service about the process for

2  self-reporting.

3          MR. ARVANETES:  Thank you, Your Honor.

4          THE COURT:  Anything else to address, Ms. Betley?

5          MS. BETLEY:  No, Your Honor.  Thank you.

6          THE COURT:  Mr. Arvanetes?

7          MR. ARVANETES:  No, sir.  Thank you very much.

8          THE COURT:  All right.  Mr. Kutzera, I am going to --

9  I hope you'll learn your lesson here.  You're paying a very

10 stiff price for a dumb thing you did.  I hope you get past this

11 and get on with your life.  I wish you good luck.

12         We'll be in recess.

13     (The proceedings concluded at 5:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1   

2  I, Yvette Heinze, a Registered Professional

3  Reporter and Certified Shorthand Reporter, certify that the

4  foregoing transcript is a true and correct record of the

5  proceedings given at the time and place hereinbefore mentioned;

6  that the proceedings were reported by me in machine shorthand

7  and thereafter reduced to typewriting using computer-assisted

8  transcription; that after being reduced to typewriting, a

9  certified copy of this transcript will be filed electronically

10  with the Court.

11  I further certify that I am not attorney for, nor employed

12  by, nor related to any of the parties or attorneys to this

13  action, nor financially interested in this action.

14  IN WITNESS WHEREOF, I have set my hand at Great Falls,

15  Montana, this 12th day of July, 2018.

16   

17  /s/ *Yvette Heinze*

18  _____
   Yvette Heinze
   United States Court Reporter